UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-80079-CV-COHN
MAGISTRATE JUDGE REID

RODNEY THOMAS,

     Plaintiff,

v.

SHERIFF RIC BRADSHAW,
et al.,

     Defendants

_____/

## REPORT OF MAGISTRATE JUDGE RE:
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
## [ECF NOS. 59 AND 63]

### I.    Introduction

Plaintiff, Rodney Thomas, filed this *pro se* civil rights action under 42 U.S.C. § 1983 against Defendants Putnam, McInnis, and Paquette for events that occurred while he was housed at Palm Beach County Jail (PBCJ). [ECF No. 15]. This Cause is presently before the Court upon Defendant Paquette's[1] Motion for Summary Judgment [ECF No. 59] and the Motion for Summary Judgment filed jointly by Defendants McInnis and Putnam. [ECF No. 63].

---

[1] The complaint contained an incorrect spelling for name of this defendant: "Dena Paqueth." [ECF Nos. 1, 15]. The Clerk is hereby directed to correct the docket so that it reflects the correct spelling: "Dena Paquette." [*See* ECF No. 59].

The case has been referred to the Undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive motions. *See* 28 U.S.C. § 636(b)(1)(B), (C); Fed. R. Civ. P. 72(b); and S.D. Fla. Admin. Order 2019-2.

The Court directed that the claims of deliberate indifference to a serious medical need proceed as they relate to these defendants for failure to provide Thomas with a medically appropriate diet. [ECF No. 21].

Following discovery, Defendant Paquette filed her motion for summary judgment [ECF No. 59]; and Defendants McInnis and Putnam filed a separate motion for summary judgment. [ECF No. 63]. The Court has considered the amended complaint [ECF No. 15], the motions for summary judgment [ECF Nos. 59, 63], Thomas's response in opposition to the motions [ECF No. 75], and the Defendants' replies [ECF Nos. 77, 79].

For the reasons stated below, the Undersigned recommends that both motions for summary judgment [ECF Nos. 59, 63] be GRANTED and the case be DISMISSED.

## II.    Standard of Review

### A. <u>Summary Judgment Standard</u>

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper:

> [i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

In *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), the Court held that summary judgment should be entered only against

> a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. (citations omitted)

Thus, pursuant to *Celotex* and its progeny, a movant for summary judgment bears the initial responsibility of informing the court of the basis for his motion by identifying those parts of the record that demonstrate the nonexistence of a genuine issue of material fact. This demonstration need not be accompanied by affidavits. *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1382 (11th Cir. 1990). If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991). It is the nonmoving party's burden to come forward with evidence on each

essential element of his claim sufficient to sustain a jury verdict. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990). The non-moving party cannot rely solely on his complaint and other initial pleadings to contest a motion for summary judgment supported by evidentiary material, but must respond with affidavits, depositions, or otherwise to show that there are material issues of fact which require a trial. Fed. R. Civ. P. 56(e); *Coleman v. Smith*, 828 F.2d 714, 717 (11th Cir. 1987). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); *Baldwin County, Ala. v. Purcell Corp.*, 971 F.2d 1558, 1563 (11th Cir. 1992). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc., supra*).

The Supreme Court has emphasized that:

> [w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986) (footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

4

judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007). As explained in this Report, Thomas's version of the events is blatantly contradicted by the record, particularly, by his own deposition testimony.

### B. A Failure to Exhaust Administrative Remedies Defense is Properly Raised Within a Motion to Dismiss

The Prison Litigation Reform Act ("PLRA") requires an inmate to exhaust his administrative remedies before filing a civil rights action. 42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516, 524 (2002); *Gould v. Owens*, 383 F. App'x 863 (11th Cir. 2010). The requirement is mandatory; and there is no discretion to waive it. *Id*. The PLRA requires proper exhaustion, which means a prisoner must comply with the procedural rules and deadlines of the institution's grievance system. *Woodford v. Ngo*, 548 U.S. 81 (2006).

The current exhaustion requirement was "designed to reduce the quantity and improve the quality of prisoner suits, [and to afford] corrections officials an opportunity to address complaints internally before allowing the initiation of a federal case. In some instances, corrective action taken in response to an inmate's

grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation." *Porter*, 534 U.S. at 519. This process "might filter out some frivolous claims" and "an administrative record clarifying the controversy's contours could facilitate adjudication." *Id.*

There are no futility or inadequacy exceptions to the PLRA's mandatory exhaustion requirement. *Alexander v. Hawk*, 159 F.3d 1321, 1325-26 (11th Cir. 1998). A prisoner must exhaust all administrative remedies that are available before filing suit, regardless of their adequacy. *Id.* at 1325-26. Even if an appeal would have been futile, the requirement that it be filed is not waived. *See Alexander*, 159 F.3d at 1325-26. And, "an untimely grievance does not satisfy the exhaustion requirement." *Johnson v. Meadows*, 418 F.3d 1152, 1153 (11th Cir. 2005). Moreover, if a prisoner "has not sought leave to file an out-of-time grievance, he cannot be considered to have exhausted his administrative remedies." *Harper v. Jenkin*, 179 F.3d 1311, 1312 (11th Cir. 1999).

"Because exhaustion of administrative remedies is a matter in abatement and not generally an adjudication on the merits, an exhaustion defense . . . [it] is not ordinarily the proper subject for a summary judgment; instead, it should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment." *Bryant v. Rich*, 530 F.3d 1368, 1374-75 (11th Cir. 2008) (internal quotation marks and citation omitted). Although "motions to dismiss for failure to

exhaust are not expressly mentioned in Rule 12(b) . . . federal courts . . . traditionally have entertained certain pre-answer motions that are not expressly provided for by the rules." *Id.* at 1375. Rather than an adjudication on the merits, "exhaustion of administrative remedies is a matter of judicial administration" and should be decided on a Rule 12(b) motion to dismiss. *Id.* (citing *Johnson v. Meadows*, 418 F.3d at 1153-54).

Where exhaustion is treated as a matter in abatement, "it is proper for a judge to consider facts outside of the pleadings and to resolve factual disputes so long as the factual disputes do not decide the merits and the parties have sufficient opportunity to develop the record." *Id.* (citing *Ritza*, 837 F.2d at 369).

The Eleventh Circuit has explained that:

> [w]hen deciding whether a prisoner has exhausted his remedies, the court should first consider the plaintiff's and the defendants' versions of the facts, and if they conflict, take the plaintiff's version of the facts as true. If in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed. If the complaint is not subject to dismissal at this step, then the court should make specific findings in order to resolve the disputed factual issues related to exhaustion.

*Myles v. Miami-Dade County Corr. & Rehab. Dep't.*, 476 F. App'x 364, 366 (11th Cir. 2012) (citing *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008)).

Nonetheless, "[a] remedy has to be available before it must be exhausted, and to be available a remedy must be capable of use for the accomplishment of its

purpose. Remedies that rational inmates cannot be expected to use are not capable of accomplishing their purposes, and so are not available." *Turner v. Burnside*, 541 F.3d at 1084 (internal citations and quotations omitted). "Under § 1997e(a), the exhaustion requirement hinges on the "availab[ility]" of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016).

### III.    Thomas's Amended Complaint

Thomas alleged that Defendants were deliberately indifferent to his medically-related dietary needs. [ECF No. 15]. Thomas alleged that between May 27, 2017, and January 2018, and thereafter, he did not receive  an adequate "renal diet" and he suffered "a deadly, low drop in blood resulting in two blood transfusions, emotional distress, stomach pains, headaches, loss of muscle mass, soft bone and organs, [and] fluid retention," which exacerbated his "existing end-stage renal failure, and put [him] at risk of contracting AIDS or other infections, such as hepatitis…" [*Id.* at 5-6]. Curiously, Thomas claims that the blood transfusions occurred on May 23 and May 26, 2017, which is prior to the time he was prescribed and served a renal diet. [ECF No. 15-1 at 4].

Thomas also claimed that "from September 30, 2017, through January 29, 2018," Defendants McInnis, Putnam, and Paquette "failed to provide [him] a nutritionally adequate diet," knowing his condition, and this failure "was likely to

inflict pain and suffering and emotional distress." [*Id.*]. Thomas also submitted an affidavit to support his complaint in which he stated:

> McInnis, Putn[a]m, and Paquet[te] were put on notice of my serious illness, wrongly used their discretion to prepare and serve a nutritionally inadequate diet that was likely to inflict pain and suffering and emotional distress . . . over a fifteen month period from March 26, 2017[,] to July, 2018, the jail's health service administrators have failed several times to keep in stock my prescription medications, and served me less than a complete nutritionally adequate diet causing me to suffer stomach pains, headaches, loss of muscle mass, soft bone and organs, fluid retention, severe emotional distress, and exacerbating my existing end-stage renal failure. I understand I was given a blood transfusion to stabilize my condition or to save my life.

[ECF No. 16 at 4].

Thomas's complaint is no model of clarity; and his allegations are somewhat threadbare. The only claim the Court permitted to proceed was that Defendants McInnis, Putnam, and Paquette were deliberately indifferent because they "knew of his serious illness (by virtue of, *inter alia*, his medical intake form and numerous grievances) but refused to provide him with a medically appropriate diet for that illness." [ECF No. 21 at 4].

Thomas seeks $35,000 in actual damages; $65,000 in nominal damages; and $135,000 in punitive damages. [ECF No. 15 at 5].

## IV.   Defendant Paquette's Defenses

A. <u>Defendant Paquette is a State Actor</u>

Pursuant to the Eighth Amendment, the State is obligated to provide certain necessities to incarcerated inmates, namely, "adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). When these obligations are delegated by contract and assumed voluntarily by a private entity, liability may be imposed under Section 1983. *West v. Atkins*, 487 U.S. 42, 55 (1988). *See also Smart v. Dep't of Corr. for Queen Anne's County*, No. 17-3606, 2019 WL 3997128, at * 4 (D. MD. Aug. 19, 2019) (private companies can be considered state actors under § 1983 "when the State has delegated a traditionally and exclusively public function to a private actor." Providing food service at a jail is a necessity and is traditionally a government function.); *Coleman v. Aramark*, 31 F. App'x 808, 809 (4th Cir. 2002) (Assuming without deciding that Aramark acted under color of state law for purposes of § 1983 by providing food service at the jail).

Although Defendant Paquette claims that she is not a state actor because she is employed by a private company which provides food services at the jail, various courts have found that individual employees of food service companies providing contract food services to inmates are state actors for purposes of a § 1983 lawsuit. *See Wilder v. Aramark Services*, Case No. 3:17cv239/RV/EMT, 2018 U.S. Dist. LEXIS 181716, *15 (N.D. Fla. Sept. 24, 2018), report and recommendation adopted,

2018 WL 5269814 (N.D. Fla. Oct. 23, 2018); *Doe v. Quinones,* No. CV 17-719, 2018 WL 1955133, at *8 (W.D. Pa. Apr. 15, 2018), report and recommendation adopted, No. 2:17CV719, 2018 WL 1951094 (W.D. Pa. Apr. 25, 2018) (finding at motion to dismiss stage that plaintiff's allegations were sufficient to find Trinity employee to be a state actor where the employee supervised the kitchen service at the county prison); *Woodstock v. Shaffer,* 169 F. Supp. 3d 1169, 1170 (D. Colo. 2016) (holding that Aramark food service employee at county jail was a state actor).

Accordingly, Defendant Paquette is a state actor under § 1983. Nonetheless, Thomas failed to properly exhaust his administrative remedies as to Defendant Paquette.

## B. *Failure to Exhaust Administrative Remedies*

Although, all parties preserved the affirmative defense of failure to exhaust within their answers and defenses, [ECF Nos. 32 at 6; 41 at 9], only Defendant Paquette asserts in her motion for summary judgment that Thomas' § 1983 action must be dismissed because he failed to exhaust his administrative remedies. [ECF No. 59]. In his sworn complaint, Thomas claimed that he filed grievances and attempted to appeal but the appeal was dismissed as untimely. [ECF No. 15 at 8]. Thomas provides no evidence to support his assertion. His statement is an admission and the record shows that he failed to exhaust his administrative remedies. "[A]n

untimely grievance does not satisfy the exhaustion requirement." *Johnson v. Meadows*, 418 F.3d at 1153.

### *1. Grievance Procedure*

On July 12, 2017, Thomas filed an inmate request asking for the rules governing the jail's grievance procedure. [ECF No. 15-1 at 8]. He was directed to complete a legal request (a green form) and forward it to the law library. [*Id*.]. Four months later, on November 6, Thomas filed an inmate legal material request asking for the jail grievance procedure. [*Id*. at 11].

The grievance procedures of the PBCJ are codified in § D-4 of the "Palm Beach County Sheriff's Office Department of Corrections Inmate Rules & Regulations," which is issued to inmates. [ECF No. 61-11]. The procedure provides that inmates should bring their complaints to the attention of the deputy assigned to the unit; and if it cannot be resolved, they are to relay the matter to the sergeant or lieutenant on rounds. [*Id*.]. If there is no resolution, inmates are to obtain a grievance form, complete it with certain details and information, and submit it "within seven days of the date of the incident, unless it was not feasible within that time period." [*Id*.]. Inmates will receive a response within fifteen days. [*Id*.]. "Inmate grievances will not be processed if they are: (1) frivolous, (2) excessive or repetitive in nature, (3) previously answered, or (4) improperly completed form." [*Id*.].

If an inmate is dissatisfied with the response, he can appeal to a division commander within five days of receiving the response. [*Id*.]. The division commander will have seven days to respond. [*Id*.]. If the inmate is not satisfied with that decision, he may appeal to the major within five days of the division commander's response. [*Id*.]. "The major's decision is final." [*Id*.]. "At any level of the administrative process, including the final level, if [the inmate] do[es] not receive a response within the time allotted for reply, including any properly noticed extension, you may consider the absence of a response to be a denial at that level." [*Id*.].

Defendant Paquette asserts that Thomas failed to exhaust his administrative remedies because he did not appeal any of his grievances through to the major. [ECF No. 59 at 6]. To the extent Thomas attempts to argue that he was unfamiliar with the process, such an assertion is not persuasive given (1) his extensive use of the process (not limited to the issues involved in this case); (2) at least one officer provided Thomas directions to complete the proper section of the form in order to file an appeal [ECF No. 15-1 at 50; ECF No. 61-12 at 5-6]; (3) the grievance form gives notice of the proper section for an appeal; and (4) Thomas continued filing duplicative grievances rather than making use of the appeals process as detailed below.

### 2.  *Thomas's Response and Facts Pertinent to Exhaustion*

In a response to one of Thomas's grievances, Nurse Shuffett confirmed that his renal diet was effective September 30, 2017. [ECF No. 15-1 at 26]. Afterward, Thomas filed more than two dozen grievances and sick call requests complaining about his meals and how, in his opinion, the meals were not in compliance with a prescribed renal diet:

1. October 1, 2017, #M17100401643 [ECF No. 15-1 at 36]

2. October 1, 2017, #M17100401643 (deemed "duplicate") [*Id*. at 37]

3. October 10, 2017, (no grievance number) [*Id*. at 38]

4. October 10, 2017, sick call request [*Id*. at 15]

5. October 13, 2017, #M17101601717 [*Id*. at 26; ECF No. 61-12 at 1-2]

6. October 23, 2017, #M17102401781 [*Id*. at 39]

7. October 24, 2017, #M17102601800 [*Id*. at 40]

8. October 31, 2017, #M17110101832 [*Id*. at 41]

9. November 2, 2017, #M17110301843 [*Id*. at 42; ECF No. 61-12 at 3-4]

10. November 3, 2017, #M17110601853 [*Id*. at 43]

11. November 11, 2017, #M1711401897 [*Id*. at 44; ECF No. 61-12 at 35-36]

12. November 12, 2017, #M17111401897 [*Id*. at 45; ECF No. 61-12 at 33-34]

13. November 15, 2017, #M17111601919 [*Id.* at 47; ECF No. 61-12 at 31-32]

14. November 15, 2017, #M17111401897 [*Id.* at 46; ECF No. 61-12 at 41-42]

15. November 17, 2017, #M17112001932 [*Id.* at 48; ECF No. 61-12 at 23-24]

16. November 22, 2017, #M17112701961 [*Id.* at 49; ECF No. 39-40]

17. November 24, 2017 (attempting to appeal prior grievances) [*Id.* at 50; ECF No. 61-12 at 5-6]

18. November 27, 2017, #M17112801988 [*Id.* at 51; ECF No. 61-12 at 29-30]

19. November 29, 2017, #M17120602016 [*Id.* at 52; ECF No. 61-12 at 13-14]

20. November 29, 2017, [*Id.* at 53; ECF No. 61-12 at 17-18]

21. November 30, 2017, #M1712060216 (deemed "duplicate") [*Id.* at 54; ECF No. 61-12 at 15-16]

22. December 1, 2017, #M17120602029 [*Id.* at 55; ECF No. 61-12 at 9-10]

23. December 2, 2017, #M1712060012 [*Id.* at 56; ECF No. 61-12 at 11-12]

24. December 3, 2017, #M17121902091 [*Id.* at 57; ECF No. 61-12 at 27-28]

25. December 6, 2017, #M17120702032 [*Id.* at 58; ECF No. 61-12 at 19-20]

26. December 7, 2017, sick call request [*Id.* at 17]

27. December 8, 2017, sick call request [*Id.* at 18]

28. December 13, 2017, #M17121902090 [*Id.* at 59; ECF No. 61-12 at 21-22]

29. December 18, 2017, #M17121902090 [*Id.* at 60; ECF No. 61-12 at 25-26]

30. July 12, 2018, #M18071301226[2] [*Id.* at 70; ECF No. 61-12 at 43-44]

Thomas's grievances alleged nearly identical issues: that the food service director or kitchen staff failed to provide him with the proper renal diet [*Id.* at 36, 38-39, 40-41, 44, 46-53, 57-60, 70 ], the sheriff failed to train the kitchen staff on preparing a proper renal diet [*Id.* at 38, 55-56], and that deputies failed to correct the errors [*Id.* at 41-43, 48]. The only grievance filed against Defendant McInnis alleged that he improperly ordered the kitchen to add peanut butter to Thomas's meal and required Thomas to provide him with a doctor's order. [*Id.* at 41].

On some occasions, Thomas filed grievances that the food he received was an error because it was identical to that served to the general inmate population [*Id.* at 36, 37, 41]. For example, he was served meaty noodles and a bun [*Id.* at 36]. Sometimes, Thomas complained in the reverse -- that he wanted the same food as the general population -- for example, he received applesauce instead of cake or

---

[2] Plaintiff's exhibit appears to be his copy of the grievance prior to the response by Nurse Shuffett. Defendant's exhibit contains the response from Nurse Shuffett that Thomas was on a renal diet from September 2017 through January 2018 and stating that there are differences between a regular diet and a renal diet.

pudding; peas instead of carrots, or potatoes instead of rice. [*Id*. at 36, 37, 39, 41].

On another occasion, Thomas received "half of a tray of beans and carrots with meat patty" and cake while the rest of the inmates were served rice. [*Id*. at 52]. On a later occasion, he conceded that some of the foods, including applesauce, were permissible in his diet. [*Id*. at 53]. Thomas also complained that he did not receive a snack with each meal. [*Id*. at 37].

On occasion, Thomas would file a sick call request on these matters and complain about being served "applesauce, carrots, corn, green[ ]beans for breakfast" and vegetables as his main course for every meal. [*Id*. at 15, 17-18, 21]. In his sick call requests, Thomas claimed he was served foods high in phosphorus and potassium and applesauce does not equate to the same food as the general population. [*Id*. at 15]. In one sick call request, Thomas asked for a doctor's order "restricting bread, processed meat, and breaded meat" and requiring a "pasta substitute" for potatoes. [*Id*. at 21].

Thomas also complained that he should not have received certain foods which were inconsistent with a renal diet: soy patties, processed meat, "raw beans, carrot[s] . . . and rice… contain[ing] other vegetables"; "cream of wheat, two slices of bread, jelly and [sugar]," "very salty beans," "half of a tray of strip-chicken and two cakes" potatoes, hotdogs, breaded meat, and cornbread. [*Id*. at 39-41, 43-46, 48, 51, 53-54,

57-58]. In his grievances, Thomas asserted that peanut butter should be avoided; and he should be served rice or pasta as a substitute for the potatoes. [*Id*. at 46, 51].

Thomas alleged in several grievances that the errors in the diet were negatively affecting his physical and mental health, caused him "to suffer metabolic disturbance as well as pain," "bone, muscle, and organ pain, itching, and lack of sleep which is affecting [him] mentally." [*Id*. at 39, 46].

Defendant Paquette found Thomas's grievance "not valid" because his "diet has been approved by a registered dietician. You receive exactly what was and is approved." [*Id*. at 36]. On a separate occasion, Defendant Paquette responded that, if Thomas felt he had received the wrong food, he should notify the deputy who would return it to the kitchen. [*Id*. at 39]. Often Thomas's grievances were rejected as a "duplicate" or "previously answered." [*Id*. at 37, 40-41, 43-49, 51-58].

Thomas's grievances complained that unnamed staff failed to correct his meals, "forcing [him] to choose between not eating or eating foods which [he] should av[oi]d." [*Id*. at 42, 49]. He noted that he filed prior grievances with food service supervisors to no avail. [*Id*. at 42]. The investigating officer responded that the "information was passed onto Trinity to be followed up by Trinity so that the diet/food can be corrected. There is no evidence to support this claim therefore it is invalid." [*Id*.]. On another occasion, Thomas complained that he informed Deputy Gray about the errors, but the kitchen still sent a regular meal. [*Id*. at 43].

18

On November 6, Thomas filed an inmate request for a copy of the diet menu. [*Id*. at 9]. Defendant Paquette directed him to send the request to "legal." [*Id*.]. On November 12, Thomas filed an inmate legal material request form asking for a copy of the diet menu. [*Id*. at 10]. Thomas was directed to contact the inmate program's chaplain because the diet menu is not in the library. [*Id*.].

On November 24, Thomas filed a grievance claiming it served as an appeal to just six of the sixteen grievances he previously submitted (October 1, October 10, October 23, October 24, October 31, November 2, and November 3). [*Id*. at 50]. He complained that the main staples were foods he needed to avoid. [*Id*.]. Sergeant Iliopoulos responded that this was not the proper protocol to appeal grievances and informed Thomas that his appeal was outside the five-day period. [*Id*.]. The officer also noted that medical and the kitchen confirmed that potatoes were not restricted from his diet. [*Id*.]. Apparently, a copy of the policy was attached to the response, but Thomas has not provided that to the Court. [*Id*.].

On December 13, Thomas filed a grievance complaining about the menu and detailing of all the items served to him. [*Id*. at 59]. However, he asked to be taken off the renal diet and placed on a regular diet. [*Id*.; ECF Nos. 61-9, 61-10]. On December 15, Thomas refused to continue the renal diet despite the potential consequences, including an "increased risk of stroke and possible death" if his "diet was not controlled along with medical care." [ECF No. 61-9]. A few days later,

Thomas contradicted his request and complained that his meals did not comply with a renal diet. [*Id*. at 60]. Approximately, seven months later, on or about July 12, 2018, Thomas filed a grievance asking to file an out-of-time grievance and alleging that a renal diet "does not exist at this facility." [*Id*. at 70].

Thomas failed to appeal any single grievance related to his allegations that he did not receive a medically appropriate diet. In his amended complaint, Thomas claims that he requested leave to file an out-of-time appeal of his prior grievances but received no response. [ECF No. 15 at 9]. Yet, Thomas did not challenge any of the material facts stated in Defendant's statement of uncontroverted facts, including, that he did not appeal one single grievance beyond the initial response. [ECF No. 60 at 7]. This amounts to an admission. *See* S.D. Fla. L.R. 56.1(c). Moreover, even in his reply, Thomas pleads "excusable negligence" for failure to exhaust his administrative remedies but gives no explanation and provides no evidence. [ECF No. 75 at 4].

Curiously, Thomas presents to the Court his grievance exhibits as one-page documents, whereas, Defendant Paquette provides two-page exhibits. [ECF No. 61-12 at 1-6, 9-22, 25-30, 43-44]. This is relevant because the second page of the form provides the section for the first level of appeal and the appeal to the major -- which Thomas left blank. This indicates that Thomas did not exhaust his administrative remedies as to Defendant Paquette and chose instead to continue to file duplicative

grievances rather than pursue an appeal. While Thomas claims the prison is in possession of personal property and documents, he gives no insight as to what those documents are or how they may be applicable to his case. [ECF No. 75 at 11]. Because Thomas did not appeal his grievances, the Court should GRANT Defendant Paquette's motion for summary judgment for failure to exhaust his administrative remedies.

## V.    Discussion

### A. Deliberate Indifference to a Serious Medical Need

Moreover, Thomas's claims fail on the merits. There is an "obligation to provide medical care for those who are incarcerated whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976). Delayed or denied access to medical care for inmates resulting in physical or mental injury constitutes a violation of constitutional rights. *Id*. To state such a claim, a plaintiff must allege facts that plausibly show: (1) the plaintiff had a serious medical need; (2) the defendant was deliberately indifferent to that need; and (3) there is a causal connection between that indifference and the plaintiff's injury. *Mann v. Taser Int'l, Inc*., 588 F.3d 1291, 1306-07 (11th Cir. 2009). The medical need must be "one that, if left unattended, pos[es] a substantial risk of serious harm." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (citations and internal quotation marks omitted). "However, not 'every claim by a prisoner that he has not received adequate medical

treatment states a violation of the Eighth Amendment.'" *McElligott v. Foley*, 182 F. 3d 1248, 1254 (11th Cir. 1999).

An Eighth Amendment claim contains both an objective and a subjective component. *Taylor v. Adams*, 221 F.3d 1254, 1257 (11th Cir. 2000). A prisoner must prove "an objectively serious need, an objectively insufficient response to that need, a subjective awareness of facts signaling the need, and an actual interference of required action from those facts." *Turner v. Sec'y, Dep't of Corr.*, 161 F. App'x 848, 849 (11th Cir. 2006) (quoting *Taylor*, 221 F.3d at 1258).

A serious medical need is considered "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill v. DeKalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994) (overruled on other grounds by *Hope v. Pelzer*, 536 U.S. 730 (2002)). The subjective component requires the plaintiff to demonstrate that the prison officials acted wantonly, with deliberate indifference to the plaintiff's serious needs. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991). Deliberate indifference is the reckless disregard of a substantial risk of serious harm; mere negligence will not suffice. *Id.* at 835-36. Consequently, allegations of medical malpractice or negligent diagnosis and treatment fail to state an Eighth Amendment claim of cruel and unusual punishment. *See Estelle*, 429 U.S. at 106. The inadvertent failure to

22

provide adequate medical care "cannot be said to constitute 'an unnecessary and wanton infliction of pain.'" *Estelle*, 429 U.S. at 105-06. *See also Wilson*, 501 U.S. at 297-98.

The Eleventh Circuit has provided guidance concerning the distinction between "deliberate indifference" and "mere negligence." For instance, "an official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997) (overruled on other grounds by *LeFrere v. Quezada*, 588 F.3d 1317, 1318 (11th Cir. 2009)). The "deliberate indifference" standard may be met in instances where a prisoner is subjected to repeated examples of delayed, denied, or grossly incompetent or inadequate medical care; prison personnel fail to respond to a known medical problem; or prison doctors take the easier and less efficacious route in treating an inmate. *See, e.g., Harris v. Coweta Cty.*, 21 F.3d 388, 393-94 (11th Cir. 1994) (indicating prison officials may nonetheless act with deliberate indifference for delaying treatment beyond a tolerable point); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989) (stating failure to respond to known medical problems or to take a less efficacious course of treatment can amount to deliberate indifference).

However, allegations that raise only claims of mere negligence, neglect, or medical malpractice are insufficient to recover on a § 1983 claim merely because

23

the patient is a prisoner. *Estelle*, 429 U.S. at 105-07. It must be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1983).

Federal courts have held that inmates are not entitled to their choice of medical care. *See Bismark v. Fisher*, 213 F. App'x 892, 897 (11th Cir. 2007) (quoting *Waldrop,* 871 F.2d at 1033 ("'[A] simple difference in medical opinion' does not constitute deliberate indifference.")); *Bowring v. Godwin*, 551 F.2d 44 (4th Cir. 1977) (courts will not "attempt to second guess the propriety or adequacy of a particular course of treatment."). As articulated in *Estelle*, "whether . . . additional diagnostic techniques or forms of treatment - is indicated is a classic example of a matter for medical judgment" and "[a] medical decision not to order" additional testing, "does not represent cruel and unusual punishment." 429 U.S. at 107.

B. <u>Analysis</u>

1. *The Renal Diet was Prescribed after Thomas's Alleged Medical Conditions and was Not the Cause of Any Medical Condition.*

Although Defendant's McInnis and Putnam argue that Thomas did not have a serious medical need, the record demonstrates otherwise. [ECF No. 63 at 7]. A serious medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F. 3d 1235, 1243 (11th Cir. 2003). According to the Emergency Department Transfer Notification, Thomas has

a history of chronic kidney disease with hemodialysis and received a blood transfusion. [ECF No. 61-6]. He was prescribed a renal diet and later asked to be removed from a renal diet plan, as noted above, as acknowledged by Defendants. [*See* ECF No. 63 at 7]. The medical record demonstrates that Thomas was counseled as to the possible negative consequences of his refusal to continue that diet. [ECF Nos. 61-9, 61-10]. However, Defendants correctly argue that Thomas cannot demonstrate that Defendants McInnis and Putnam were deliberately indifferent to that need or that there is any causal connection between the indifference and any injury, as required per *Estelle*. [ECF No. 63 at 9-10]. Much of the record contradicts Thomas's claims.

To the extent Thomas argues that he was prescribed a renal diet from March 2017 through the present date, at least one of his grievances contradicts that assertion. On October 13, Thomas alleged that his breakfast meal was a "five item liquid diet" prescribed by a doctor in order to punish him for his complaints about the renal diet. [*Id*. at 26]. Nurse Shuffett responded that his renal diet was first prescribed on September 30, 2017, and not before. [*Id*.]. Shuffett noted that there was no medical order for a liquid diet and directed Thomas to inform the deputy of any errors so the correct diet could be obtained from the kitchen. [*Id*.].

Thomas claimed that as a result of the Defendants' refusal to provide him with the proper renal diet, he needed two blood transfusions. [ECF No. 15 at 5-6]. Thomas

25

alleged the transfusions occurred on May 23 and May 26, 2017, prior to the dates relevant to his claims, prior to his arrival at PBCJ, and prior to the prescription of the diet itself. [ECF No. 15-1 at 4]. According to the "Emergency Department Transfer Notification," Thomas had a blood transfusion on May 26, 2017. [ECF No. 61-6, 61-7]. At deposition, Thomas admitted that the blood transfusions had nothing to do with the diet at PBCJ, that he had stomach pains before he started the renal diet, and claimed the renal diet caused itching and cramps. [ECF No. 62-1 at 47-49].

Moreover, at his deposition, Thomas admitted he has never been advised by a physician that not eating a renal diet would cause weak organs or weak bones. [ECF No. 62-1 at 16]. Thomas admitted that he came to this conclusion based on personal study and not medical information. [*Id.* at 15-16, 37, 66]. He stated he had "soft bone" because he could "feel it" and not because of any medical evaluation or test. [*Id.* at 51]. Thomas admitted that the renal diet did not have "anything to do with" being at risk for contracting AIDS or other infection and that no doctor ever told him that the two-month renal diet caused any of his medical conditions. [*Id.* at 53, 64-65, 67]. Finally, as explained above, there are no grievances that make any allegation against Defendants McInnis or Putnam stating that they refused to provide him with a proper renal diet or that they were somehow otherwise responsible. Therefore, it is impossible to impute liability upon Defendants where their "alleged" conduct has no causal connection to any injury or illness.

    2.  *Thomas's Refusal of a Nutritionally Adequate Renal Diet Amounts to a Difference in Medical Opinion and is Not Actionable.*

Margaret Kirch, the licensed dietician, asserts in her affidavit that Thomas's diet was nutritionally adequate for an individual diagnosed with acute or chronic renal failure. [ECF No. 61-2]. Kirch approved the jail menus identifying the permissible foods for various diets including, but not limited to, regular, cardiac, vegan, dental soft, and renal. [ECF No. 61-3 at 1-56]. The menus for a proper renal diet include applesauce, grits or farina with sugar, breakfast sausage, poultry, pasta, poultry patties, rice, green beans, carrots, mixed vegetables, and certain fruits. [ECF No. 61-3 at 1-56]. Cake and snacks are not included in a renal diet. [*Id.*]. As explained in the grievance section above, Thomas complained about foods that were specifically included in a renal diet. He also complained that he wanted to receive food items that were *specifically excluded* from a renal diet.

Moreover, Thomas's own actions undermine his claims that he was compliant with medical advice. Not only did he request restricted items (i.e. cake) and refused permitted items (i.e. vegetables, applesauce, etc.), just three months from the time the diet was prescribed, Thomas refused to remain on the renal diet despite being advised of the potential consequences as indicated on his "Refusal of Treatment" form. [ECF Nos. 61-9, 61-10; *see also* Thomas's deposition ECF No. 62-1 at 24-25, 35, 38]. Similarly, the evidence contradicts Thomas's assertions in his reply. Thomas is less than genuine in his claims that medical discontinued his diet on December 15,

27

2017, but the kitchen continued to serve him a renal diet until January 29, 2018. [ECF No. 75]. Not only did Thomas make the request to have the renal diet discontinued, he contradicted his own request to be taken off the renal diet by claiming the kitchen failed to serve him a renal diet as evidenced by the grievance filed on December 18. [ECF No. 15-1 at 60]. In his deposition, Thomas confirmed that his diet was not changed back to a renal diet after December 2017. [ECF No. 62-1 at 25].

In his deposition, Thomas claimed that he was presently on a renal diet at his current facility which included turkey, beans, peas, carrots, rice, noodles, eggs, cereal oatmeal, apples, applesauce, bread, jelly, milk and apple juice and that he had no complaints about the food except for cottage cheese. [ECF No. 62-1 at 13]. Yet, many of these items served as the basis for his grievances at PBCJ which he alleged were not part of a renal diet. He admitted during deposition that at least one complaint was based on wanting something "edible." [*Id.* at 21]. When confronted with the similarity of the diets served between PBCJ and the current facility, Thomas said it was different because the food was not prepared the same, the time breakfast was served was different, and he did not like that PBCJ served potatoes, tomatoes, and cold cabbage. [*Id.* at 22]. Similarly, at deposition, Thomas admitted that he was grieving because he was not served grits, noodles, rice, or oatmeal "so the diet was basically day after day, the same thing. It was the same food" but inappropriate for

a renal diet. [*Id*. at 40]. Thomas also admitted the likely reason for his "lack of muscle mass" (which was not diagnosed) was the result of him not eating his food because it was the same without variety and he did not like the way it was prepared. [*Id*. at 62-63]. He admitted that potatoes were not prohibited from a renal diet, but that, instead, "you are supposed to restrict yourself." [*Id*. at 68].

At best, Thomas's complaint essentially amounts to a disagreement about which foods should be on a renal diet. Furthermore, upon close examination of Thomas's grievances, complaint, and response, it is clear he shifts back and forth to confuse the issue: whether he wanted to be served a renal diet. He cannot have it both ways and sustain a claim of deliberate indifference to a serious medical need. This is insufficient to support his deliberate indifference claim. *Waldrop*, 871 F.2d at 1033 ("'[A] simple difference in medical opinion' does not constitute deliberate indifference.").

Paquette's statement of uncontroverted facts remains unchallenged by Thomas. [ECF No. 60]. Paquette was not responsible for prescribing the diet, the menu planning, food preparation, or food service. [*Id*.]. At deposition, Thomas admitted he was suing Paquette because she is the individual who responded to his grievances but not because she failed to address the grievances. [ECF No. 62-1 at 57]. Defendants McInnis and Putnam argue that they had no control over the food or prescribing the diet. [ECF No. 10]. At best, Putnam admits to denying an

administrative grievance filed by Thomas, but this is insufficient for imposing liability under § 1983. [*Id.*]. "[M]ere participation in the grievance process, including signing a grievance response, is insufficient to show personal involvement. Rather, liability under § 1983 must be based upon active unconstitutional behavior, not a 'mere failure to act.'" *King v. Henry*, Case No. 6:15-cv-17, 2018 WL 633527, at *27 (S.D. Ga. Jan. 30, 2018) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). *See also Rickerson v. Gills*, No. 5:11cv279/MP/GRJ, 2012 WL 1004733, at *3 (N.D. Fla. Feb. 8, 2012) (finding prisoner failed to state § 1983 claim against prison official whose sole involvement was to review and deny plaintiff's administrative grievance.). Thomas admitted that neither McInnis nor Putnam were in his unit and that he never had any conversation with either of them about his food service or anything else. [ECF No. 62-1 at 69].

Finally, the meals were nutritionally adequate for an individual on a renal diet and any necessary substitutions were made from the same food group. [ECF No. 61-2]. Thomas has no medical training and is not a licensed dietician. [ECF No. 62-1 at 9]. Thomas does not provide any sufficient evidence to rebut the showings made by the Defendants or evidence to support his conflicting assertions. Thomas's story is contradicted by the record, so much so, that no reasonable jury could believe it. Accordingly, because there are no genuine issues as to any material fact, the

Defendants are entitled to summary judgment as a matter of law and their motions should be GRANTED.

3. <u>McInnis's and Putnam's Qualified Immunity Defense</u>

Defendants McInnis and Putnam assert they are entitled to qualified immunity. [ECF No. 63]. Qualified immunity protects government officials from suit in their individual capacities when they perform discretionary functions so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 815, 818 (1982); *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008). "Qualified immunity involves a two-step inquiry. The first question is whether '[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show [that Defendants'] conduct violated a constitutional [or statutory] right?'" *Hadley v. Gutierrez*, 526 F.3d at 1329 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Here, Thomas alleges that Defendants McInnis and Putnam were deliberately indifferent to his serious medical need. However, as explained above, Thomas complaint is, at best, a difference of medical opinion, which does not rise to the level of a constitutional violation. More importantly, Thomas admitted at deposition that he never raised his concerns or grievances directly to McInnis or Putnam and that neither officer was assigned to his unit. Because the facts as alleged do not show that

the Defendants' conduct violated Thomas's constitutional rights, the affirmative defense of qualified immunity is, essentially, moot.

## VI.    Recommendation

As to Defendant Paquette, Thomas failed to exhaust his administrative remedies. Moreover, Thomas's claim of deliberate indifference fails as a matter of law against all Defendants. There is no genuine issue of any material fact; and the Defendants are entitled to judgment as a matter of law. Therefore, it is recommended that Defendant Paquette's Motion for Summary Judgment [ECF No. 59] be GRANTED; that Defendants McInnis and Putnam's Motion for Summary Judgment [ECF No. 63] be GRANTED; and the instant case be DISMISSED with prejudice and CLOSED.

Objections to this Report may be filed with the District Court Judge within fourteen days of receipt of a copy of the Report. Failure to do so will bar a *de novo* determination by the District Court Judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 149 (1985).

Signed this 28th day of June, 2020.

UNITED STATES MAGISTRATE JUDGE

cc:    Rodney Thomas
       190154376

Turner Guilford Knight Correctional Center
7000 NW 41st Street
Miami, FL 33166
PRO SE

Richard A. Giuffreda
Gregory James Jolly
Purdy Jolly Giuffreda Barranco & Jisa PA
2455 E. Sunrise Boulevard, Suite 1216
Fort Lauderdale, FL 33304
Tel: 954-462-3200
Fax: 462-3861
Email: richard@purdylaw.com
Counsels for Defendants McInnis and Putnam

Leonor Maria Lagomasino
Hinshaw & Culbertson, LLP
2525 Ponce de Leon Boulevard, 4th Floor
Coral Gables, FL 33134
Tel: 305-358-7747
Fax: 305-577-1063
Email: llagomasino@hinshawlaw.com
Counsel for Defendant Paquette